UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| VICTOR SAMOITA MACHOKA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| VS. | ) | |
| | ) | CIVIL ACTION NO. |
| WILHELM BIERMAN, Field Office | ) | |
| Director, U.S. Citizenship & Immigration | ) | 3:21-CV-2967-G |
| Services, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is Wilhelm Bierman's ("Bierman"), in his official capacity as

Field Office Director, Dallas Field Office of U.S. Citizenship and Immigration

Services (the "defendant" or "USCIS")[1] motion for summary judgment pursuant to

Federal Rule of Civil Procedure 56.  Defendant's Motion for Summary Judgment

---

[1]      Although the plaintiff Victor Machoka names Bierman, in his official capacity as Field Office Director, Dallas Field Office of USCIS, as the defendant, "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690 n.55 (1978).  "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  The court, therefore, considers USCIS as the defendant in this lawsuit.

("Motion for Summary Judgment") (docket entry 19).  For the reasons set forth

below, USCIS's motion for summary judgment is granted.

## I.  BACKGROUND

This is a civil action brought by the plaintiff Victor Samoita Machoka (the

"plaintiff" or "Machoka") under 8 U.S.C. § 1421(c) requesting that the court grant

Machoka naturalization as a United States citizen.  Petition for Judicial

Naturalization ("Complaint") (docket entry 1) at 1.  Below are the facts relevant to

USCIS's motion for summary judgment, which, unless otherwise noted, are

undisputed.

### A.  Factual Background

Machoka is a Kenyan citizen.  Petitioner's Brief in Support of Naturalization

Petition (docket entry 2) at 1.  In the early 2000s, Machoka met his now wife, Mary

Mutinda ("Mutinda"), and began living with her in Kenya around 2003.  Brief to

Support Defendant's Motion for Summary Judgment ("Brief in Support") (docket

entry 20) at 3; *see also* Appendix to Support Defendant's Motion for Summary

Judgment ("Appendix") (docket entry 21) at 3:13-18, 12:13-20.  While Machoka and

Mutinda lived together they had two children:  Ruth on April 20, 2004, and Brian on

February 22, 2011.  Appendix at 4:5-17.  By 2011, Machoka was living with

Mutinda, Ruth, Brian, and Machoka's stepdaughter, Florence.  Brief in Support at 3;

*see also* Appendix at 21:1-5.  Although Machoka and Mutinda officially married on

- 2 -

October 12, 2012, Administrative Record ("CAR") (docket entry 16) at 163, USCIS asserts that Machoka and Mutinda had been legally married under Kenyan customary law prior to October 12, 2012.  Brief in Support at 8-9.  Machoka, however, disputes this assertion.  Petitioner's Response to Respondent's Motion for Summary Judgment ("Response") (docket entry 22) at 7.

In 2009, Machoka applied to the United States Diversity Immigrant Visa ("DV") program, "also known as the green card lottery."  Brief in Support at 3-5; *see also* Appendix at 9:14-20.  The DV program "makes available up to 55,000 immigrant visas annually; the State Department randomly draws applicants from countries with low rates of immigration to the United States."  Brief in Support at 3-4.  An applicant for the DV program must provide specific information in his application, including "[t]he name[s], date[s] and place[s] of birth and gender of the petitioner's spouse and child[ren], if any, (including legally adopted and step-children), regardless of whether or not they . . . intend to accompany or follow to join the petitioner should the petitioner immigrate to the United States."  22 C.F.R. § 42.33(b)(1)(v).  The applicant must also provide "a photograph of the petitioner and of his or her spouse and all unmarried children under the age of 21 years."  *Id*. § 42.33(b)(2).

If the government selects an applicant, he must then appear for an interview before the government can approve the applicant's visa.  U.S. Department of State – Bureau of Consular Affairs,

- 3 -

https://travel.state.gov/content/travel/en/us-visas/immigrate/diversity-visa-program-entr

y/diversity-visa-interview/diversity-visa-prepare-for-interview.html (last visited Sept.

19, 2022).  The government requires that the applicant's spouse and any qualified

unmarried children, that are immigrating with him, attend the interview.  U.S.

Department of State – Bureau of Consular Affairs,

https://travel.state.gov/content/travel/en/us-visas/immigrate/diversity-visa-program-entr

y/diversity-visa-interview/diversity-visa-applicant-interview.html (last visited Sept. 19,

2022).  If the applicant's spouse and children will be immigrating at a different time,

the government will schedule a separate interview at a later date.  *Id*.

        In his 2009 DV application, Machoka marked that he did not have any

children, even though Ruth was already born.  CAR at 23.  On April 6, 2011, during

his DV interview, Machoka reaffirmed, under oath, that he did not have any children,

even though Ruth and Brian had both been born.  *Id.*  Furthermore, Machoka wrote

that he was not married throughout his application process.  *Id.*  The State

Department approved Machoka's DV Application, and he obtained permanent

resident status on April 23, 2011.  *Id*.  Shortly after immigrating to the United States,

Machoka submitted an I-130, Petition for Alien Relative immigration form on behalf

of his wife Mutinda and three children, Ruth, Brian, and Florence.  *See generally* CAR

at 47-48.  The government approved his application on August 3, 2013.  *Id*. at 47.

During the I-130 process, however, the United States Embassy in Kenya flagged

Machoka because it considered his path to the United States to be a "Fraudulent Path to Immigration" and believed Machoka's visa was "improperly gained." *Id.* at 44.

On July 5, 2019, Machoka filed an N-400 application for naturalization in the United States under the Immigration and Nationality ACT ("INA") § 316 (also titled 8 U.S.C. § 1427). CAR at 22. As part of the application, Machoka answered, under penalty of perjury, "no" to the following questions:

> 31. Have you **EVER** given any U.S. Government officials any information or documentation that was false, fraudulent, or misleading?
>
> 32. Have you **EVER** lied to any U.S. Government officials to gain entry or admission into the United States or to gain immigration benefits while in the United States?

*Id.* at 199, 201. On February 13, 2020, Machoka participated in an interview for his naturalization application, where he was asked and answered the following questions:

> Q. How many children do you have?
> A. 3
>
> Q. Who is the mother of the 3 children?
> A. Mary Nduku Mutinda
>
> Q. Why did you not claim any of the children on your visa application?
> A. I missunderstood the application
>
> Q. You have 3 kids ranging from the years 1999-2011 with Mary Mutinda but were not married?
> A. Did not feel it was important to be married then.

> We lived together and conducted our life
> together . . .
>
> Q.   Have you ever lied under oath?
> A.   No
>
> Q.   Did you think by not claiming your kids that it
>      would affect you not getting your visa?
> A.   No

*Id.* at 2-3 (cleaned up).  On August 13, 2020, Machoka participated in another

naturalization interview, where, under penalty of perjury, he did not change his

answers to questions 31 and 32 that he provided in his initial application.  *Id.* at

116-17.  On September 8, 2020, the government denied Machoka's naturalization

application because of "Poor Moral Character (False Testimony, Lying)" and "Finding

Fraud."  *Id.* at 122.  Specifically, the government found that Machoka had lied about

the existence of his children in his initial DV application and 2011 DV interview, and

had he been truthful about his children in his 2011 DV interview, the immigration

officer would have denied his application.  *Id.* at 22-23.

## B.  Procedural Background

On November 3, 2020, Machoka filed a Form N-336 – Request for a Hearing

on a Decision in Naturalization Proceedings.  CAR at 127.  Machoka asserted that he

was neither married nor had children when he applied to the DV program, because in

Kenya people are not thought of as married until the man pays "a dowry to the

woman's family" and a man is not considered to be a father "until such time as we

- 6 -

register as the father of the children." *Id.* at 163.  Machoka further stated that he did not get formally or customarily married to Mutinda until October 12, 2012, at which time he paid Mutinda's family "the necessary dowry to marry her" and for him "to be the father" of the three children.  *Id*.  As such, Machoka argued, he could not have lied or committed fraud on his application and all the information was correct "under the laws and culture" of Kenya.  *Id*.

To support his Form N-336 request, Machoka submitted birth and marriage certificates.  Brief in Support at 8.  The birth certificates for Florence, Ruth, and Brian all list Machoka as the children's father.  CAR at 141-45.  Brian's certificate states that he was born on February 22, 2011, and registered on March 31, 2011.  *Id.* at 145.  Florence and Ruth's certificates state that they were born on November 27, 1999, and April 20, 2004, respectively, and were both registered on October 5, 2011. *Id.* at 141, 143.  Machoka also submitted DNA tests for the three children that show he is Ruth and Brian's biological father but not Florence's biological father.  *Id.* at 5. Machoka and Mutinda's marriage certificate states that they got married on October 24, 2012; however, Machoka and Mutinda also marked the word "customary" under the "condition" column on their certificate.  *Id.* at 136.  On July 29, 2021, USCIS vacated the original denial of Machoka's naturalization but continued to deny Machoka naturalization or a request for a hearing.  *Id.* at 4.

- 7 -

Machoka timely appealed USCIS's denial, Brief in Support at 9, and filed his

complaint on November 24, 2021.  Complaint at 1.  On August 1, 2022, as part of

the current litigation, Machoka was deposed.  *See* Appendix at 1.  During the

deposition, Machoka explained that he did not bring Mutinda or his children to the

immigration office when he originally filled out his DV form because there was a

short one-month period for him to fill out the form; Mutinda was working and his

children were at school during the week so they could not go during that time; and

the immigration office might be closed on the weekend.  *Id.* at 8:18-9:8.  Instead,

Machoka reasoned that if he ended up receiving a DV visa, he could just bring his

family later.  *Id.* at 9:8-9.  Machoka, however, also stated that he did not disclose

Mutinda's existence or that he had children during his 2011 DV interview because

"the guy who advise me not to disclose anything said, okay, if you're going to say you

are married or you have kids, they might not give you the visa."  *Id.* at 5:12-18.

Machoka was then asked to clarify his previous comment:

> Q.   But anyway, so you were concerned that if you
>       disclosed your family, that you were married and
>       you had kids, they might not give you the visa based
>       on the advice you got from this other person?
> A.   Yes . . .
>
>       So when they send me that I won it, normally what
>       do you do – if you won it, you were supposed to
>       include now your family.  You have to disclose and
>       say that I was – I'm with this person and
>       this person, but that one brings you a 50/50 chance
>       because they might think, why did he not include

> them the first time.  And now you are bringing them
> in.
>
> That's – honestly, that's the logic over there in
> Kenya.  If you – if you – you apply that you are
> single and then later on you indicate
> your family, they might say why did you not
> indicate them at the first time . . . .
>
> They told me that since you applied by yourself,
> don't bring them in because if you bring in, they
> might think that you are lying and they might not
> give you the visa.  So that makes me to lie that I'm
> just myself.

*Id.* at 5:20-7:1.  Machoka then reiterated that he did not disclose Mutinda or his

children in the 2011 DV interview because he had not included them in his original

application in 2009, and "feared that if I include them, they might think that I'm

lying" and not give him a visa.  *Id.* at 11:4-8.  Finally, Machoka was asked to explain

one of his answers in his naturalization form:

> Q.    Question 32:  "Have you ever lied to any US
>       government officials to gain entry or admission into
>       the United States or to gain immigration benefits
>       while in the United States?"  You answered no to
>       that question, correct, Victor?
> A.    Yes, sir.
>
> Q.    And that's not true.  You did lie to US Consul
>       officer in 2011; right?
> A.    Yes, sir.
>
> Q.    And that lie was to gain entry into the United
>       States; correct?
> A.    Yes, sir.

> Q.    Okay.  Why in February of 2020 did you answer no
>        to this question during your interview?
> A.    It's what – I think I got no answer why I lied.
>
> Q.    Okay.  And just – just because there might be a
>        hearing or trial on this and I want to make sure I
>        understand everything you remember, there's no
>        other reason you can remember sitting
>        here today why you answered no to Question 32?
>
> THE WITNESS:    Sorry.  I don't know the answer.

*Id.* at 16:3-17:1.

During the deposition, Machoka also stated that he, Mutinda, Florence, Ruth, and Brian were all living with each other as a family in 2011 and that at that point the community considered them all to be a family.  Appendix at 21:1-14.  Machoka further explained that he was not considered to be the father of the three children until he formally married Mutinda.  *Id.* at 21:18-21.  Machoka, however, did register himself as Ruth's father on October 5, 2011, shortly before he formally married Mutinda to unite his family.  *Id.* at 22:6-20, 24:19-22.

USCIS filed its motion for summary judgment on August 26, 2022, alleging there is no dispute that Machoka cannot qualify for naturalization and United States citizenship because:  (1) he was not eligible for lawful admission after he lied about not having children on his DV application and during his 2011 DV interview; and (2) his lies during the DV application and naturalization processes demonstrate he lacks good moral character.  Brief in Support at 2-3.  Contending that Machoka cannot qualify for naturalization, USCIS asks the court to grant summary judgment and

- 10 -

deny Machoka's petition for naturalization.  *Id.*  Machoka filed his response to

USCIS's motion for summary judgment on September 7, 2022, arguing that there are

triable issues of fact because:  (1) Machoka's misrepresentations about his family were

immaterial; and (2) the court is not barred from concluding that Machoka is of good

moral character.  Response at 1-2.

## II.  ANALYSIS

### A.  Judicial Review of Naturalization Denials

A district court reviews the denial of a Naturalization Application *de novo*,

pursuant to the Immigration and Nationality Act.  8 U.S.C. § 1421(c).  Section

1421(c) provides:

> A person whose application for naturalization . . . is
> denied, after a hearing before an immigration officer under
> section 1447(a) of this title, may seek review of such denial
> before the United States district court for the district in
> which such person resides. . . .  Such review shall be de
> novo, and the court shall make its own findings of fact and
> conclusions of law and shall, at the request of the
> petitioner, conduct a hearing de novo on the application.

*Id.*; see also *Aparicio v. Blakeway*, 302 F.3d 437, 440 (5th Cir. 2002) ("Rather than

conducting an administrative review, the district court reviews the case *de novo* and

makes its own findings of fact and conclusions of law."); 8 C.F.R. § 336.9(a)

("[Section 1421(c) provides] the sole and exclusive procedures for requesting judicial

review of final determinations on applications for naturalization . . . .").  Another

federal court has stated that a district court "must decide the issues upon the

testimony which it hears, and that neither the testimony heard by the [BCIS] Examiner, his findings, nor his recommendation are of any consequence." *Application of Murra*, 178 F.2d 670, 672 (7th Cir. 1949) (citation and quotation marks omitted).

Under section 1421, administrative review of naturalization denials is a prerequisite for judicial review. *See* 8 U.S.C. § 1421(c) (requiring "a hearing before an immigration officer" before seeking judicial review in a district court). Interpreting this section, the Fifth Circuit stated in *Aparicio* that an applicant may:

> appeal to the district court . . . if they either sought administrative review and the application was again denied, or if they sought administrative review and the review was delayed for more than 120 days.

302 F.3d at 440 (citation omitted); see also *Chavez v. Immigration and Naturalization Service*, 844 F. Supp. 1224, 1225 (N.D. Ill. 1993) (stating that Congress did not intend "to permit a district court to circumvent the appeals process provided for by statute.").

In this case, after the government denied his application for naturalization, Machoka filed a request for a hearing on the denial of his naturalization. CAR at 127. Machoka was denied a hearing before an immigration officer on July 29, 2021. *Id.* at 4. Because Machoka was denied further administrative review, he has exhausted the administrative remedies available to him and has satisfied the jurisdictional prerequisite section 1421(c).

- 12 -

B. <u>Evidentiary Burdens on Motion for Summary Judgment</u>

Summary judgment is proper when the pleadings and evidence on file show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corporation v. Catrett*, 477 U.S. 317, 323 (1986); *Wallace v. Texas Tech University*, 80 F.3d 1042, 1046-47 (5th Cir. 1996).  When, as here, the movant bears the burden of proof on a claim for which it is moving for summary judgment, the movant must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in [its] favor." *Fontenot v. Upjohn Company*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original).  The movant's showing must be sufficient for the court to conclude that no reasonable trier of fact could find other than for the movant, otherwise there is a genuine issue of fact and summary judgment cannot be granted. See *Anderson*, 477 U.S. at 248-49.

- 13 -

Once the moving party has carried its burden, the nonmovant must then direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323-24. Although all of the evidence must be viewed in a light most favorable to the motion's opponent, *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Company*, 398 U.S. 144, 158-59 (1970)), neither conclusory allegations nor unsubstantiated assertions will satisfy the non-movant's summary judgment burden. *Little v. Liquid Air Corporation*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.), *cert. denied*, 506 U.S. 825 (1992). If the nonmovant's "evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.

## C.  Application

An applicant seeking naturalization must strictly comply with the requirements for citizenship that Congress established, *Fedorenko v. United States*, 449 U.S. 490, 506-07 (1981), and the applicant bears the burden of establishing "eligibility for citizenship in every respect." *Immigration and Naturalization Service v. Pangilinan*, 486 U.S. 875, 886 (1988) (quoting *Berenyi v. District Director, Immigration and Naturalization Service*, 385 U.S. 630, 637 (1967)); 8 C.F.R. § 316.2(b) ("The applicant shall bear the burden of establishing by a preponderance of the evidence that he or she meets all of the requirements for naturalization . . . ."). "[W]hen

doubts exist concerning a grant of [citizenship], generally at least, they should be resolved in favor of the United States and against the claimant." *United States v. Manzi*, 276 U.S. 463, 467 (1928).

USCIS argues that Machoka cannot establish two of the naturalization requirements. First, USCIS contends that Machoka was not lawfully admitted for permanent residence in the United States. Brief in Support at 2; *see* 8 U.S.C. § 1427(a)(1). Second, USCIS argues that Machoka has not been a person of "good moral character" during his period of residency in the United States. Brief in Support at 2-3; *see* 8 U.S.C. § 1427(a)(3).[2]

### 1. *Machoka Was Not Lawfully Admitted for Permanent Residence*

USCIS's first argument is that Machoka was not lawfully admitted to the United States because he willfully made material misrepresentations during the DV

---

[2]     USCIS argues that Machoka lied about both not having children and not being customarily married to Mutinda at the time he participated in the DV process and applied for naturalization, and that Machoka's lies demonstrate he lacks good moral character. Brief in Support at 21-22. Machoka does not dispute that he lied about not having children in his application. Petitioner's Brief in Support of Naturalization Petition at 2. He does, however, maintain that he and Mutinda did not get customarily or formally married until 2012. Response at 7. Although USCIS supports its argument that Machoka and Mutinda were customarily married with circumstantial evidence, *see* Brief in Support at 21-22, it is unnecessary for the court to analyze whether USCIS has carried its burden on this fact for summary judgment purposes. USCIS sufficiently demonstrates that there is no genuine dispute of material fact regarding Machoka's lack of good moral character based on his misrepresentations about his children. The court, therefore, does not analyze whether, for summary judgment purposes, Machoka and Mutinda were customarily married.

application process.  To be eligible for naturalization, an applicant must have "been lawfully admitted to the United States for permanent residence in accordance with all applicable provisions of the Act." *Matter of Longstaff*, 716 F.2d 1439, 1441 (5th Cir. 1983), *cert. denied*, 467 U.S. 1219 (1984).  "Admission is not lawful if it is regular only in form.  The term 'lawfully' denotes compliance with substantive legal requirements, not mere procedural regularity." *Id*.

Congress has enumerated certain categories of applicants who "are ineligible to receive visas and ineligible to be admitted to the United States." 8 U.S.C. § 1182(a). One of these categories includes "[a]ny alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter . . . ." *Id.* at § 1182(a)(6)(C)(i).  In this case, USCIS asserts that Machoka was not lawfully admitted to the United States for permanent residence because he failed to disclose his children in his 2009 DV application and in 2011 also "willfully misrepresented in oral testimony under oath to a U.S. Consul officer that he had no children" in order "to obtain immigration benefits," and that him having children was a material fact to his DV application and interview.  Brief in Support at 12-14.

Machoka does not dispute that he willfully lied about his children in order to obtain immigration benefits.  *See* Petitioner's Brief in Support of Naturalization

Petition at 2 ("Machoka admits that he lied on the form by stating that he had no

children, when, in fact, he had two young Kenyan children"); Appendix at 11:6-8

(during Machoka's deposition, he stated that he did not disclose his family in the

2011 DV interview because he had not initially disclosed them in his initial

application and "feared that if I include them, they might think I'm lying and then"

not give him a visa); Response at 4 ("Machoka has previously admitted in his petition

to this court that he did labor under that misconception in 2011, that disclosure of

the existence of his two Kenyan children 'somehow' might have led to the denial of a

Diversity visa.").  Instead, Machoka contends that his misrepresentations were not

material, and, therefore, there is a genuine dispute of material fact.  *See generally*

Response at 2-4.  A misrepresentation was material if it "had a natural tendency to

influence the decisions of the Immigration and Naturalization Service." *Kungys v.*

*United States*, 485 U.S. 759, 772 (1988); see also *Witter v. Immigration and*

*Naturalization Service*, 113 F.3d 549, 554 (5th Cir. 1997) (applying the *Kungys*

materiality test to section 1182(a)(6)(C)(i)), *cert. denied*, 528 U.S. 1075 (2000);

*Parlak v. Holder*, 578 F.3d 457, 464-65 (6th Cir. 2009), *cert. denied*, 560 U.S. 965

(2010).

   USCIS argues that there are three reasons why there is no genuine dispute that

Machoka's misrepresentations were material.  First, USCIS argues that had Machoka

disclosed he had children during his 2011 DV interview, the immigration officer

would have been required to deny Machoka's visa application.  Brief in Support at

13.  USCIS points to the fact that an applicant for the DV program must provide

specific information in their initial application, including "[t]he name[s], date[s] and

place[s] of birth and gender of the petitioner's spouse and child[ren], if any,

(including legally adopted and step-children), regardless of whether or not they . . .

intend to accompany or follow to join the petitioner should the petitioner immigrate

to the United States."  22 C.F.R. § 42.33(b)(1)(v); Brief in Support at 12.  USCIS

then cites to the Foreign Affairs Manual, which states that if an immigration official

discovers that an applicant failed to disclose his spouse or children on his initial

application, the officer "must deny the application[] . . . unless such spouse or child

was acquired subsequent to submission of qualifying DV entry."  9 FOREIGN AFFAIRS

MANUAL ("FAM") § 42.33(c) N6.6 Derivative Status (CT: Visa-1555; 09-30-2010);

Brief in Support at 13.

 USCIS emphasizes that Machoka does not dispute that he failed to disclose his

children in his initial 2009 DV application and then also lied about not having

children during his 2011 DV interview.  *See* Brief in Support at 12; Appendix at

11:6-8 (during Machoka's deposition, he admitted that he did not disclose his family

in his initial application and worried that if he included them in his 2011 DV

interview he might not get a visa).  USCIS argues, therefore, that Machoka's

misrepresentation about his children to the immigration officer in his 2011 DV

interview was material because it would have influenced the officer, as the officer would have then been required to reject Machoka's visa application under the FAM guidelines since he would have discovered that Machoka failed to disclose his children on his initial DV application.  Brief in Support at 13-14.

Next, USCIS argues that Machoka's misrepresentations were material because children count toward the 55,000-person annual cap on diversity immigration, and, therefore, had the officer known about Machoka's children, it would have influenced the immigration officer's decision on Machoka's visa because the officer might not have had space for Machoka and his children.  Brief in Support at 13-14.; *see* 8 U.S.C. § 1151(e).  USCIS directs the court to *Ohene v. Zanotti*, No. 1:20-CV-869, 2022 WL 479771 (E.D. Va. Feb. 16, 2022), where that court addressed a similar situation and held that "the existence of a yearly statutory cap on visa grants suggests that children are material to the grant or denial of a visa application."  *Id*. at *7; Brief in Support at 14.

Finally, USCIS argues that Machoka's misrepresentations were material because the existence of his children would have influenced the immigration officer's public charge assessment, which could have led to denying Machoka his visa.  Brief in Support at 14-15.  Any applicant that the immigration officer determines "is likely at any time to become a public charge is inadmissible" for a visa.  8 U.S.C. § 1182(a)(4)(A).  In determining whether an applicant is a public charge, an

- 19 -

immigration officer must consider, among other factors, the applicant's family status, assets, resources, and financial status.  *Id.* at § 1182(a)(4)(B)(i)(I)-(V).

USCIS has pointed to specific evidence in the record to demonstrate there is no genuine dispute that Machoka's misrepresentations were material.  USCIS cites to specific statutory law and internal guidelines indicating that the immigration officer would have been required to reject Machoka's application.  Additionally, although *Ohene* is not precedent, the court concludes that USCIS's and the *Ohene* court's arguments are persuasive.  It follows that whether a DV applicant has children would influence an immigration officer's decision because the existence of a yearly cap on diversity immigration visas means that the officer might not be able to approve the applicant and his children for visas.  See *Ohene*, 2022 WL 479771 at *7.  Finally, the existence of Machoka's children directly impact his family status, assets, resources, and financial status for public charge purposes.  It logically follows, therefore, that the existence of Machoka's children is a fact that had a natural tendency to influence the immigration officer's decision on whether Machoka could be a public charge, making Machoka's misrepresentations material.  Hence, USCIS has sufficiently carried its burden by directing the court to specific evidence as to why there is no dispute that Machoka's misrepresentations were material.

Because USCIS has sufficiently carried its summary judgment burden, the burden shifts to Machoka to demonstrate that there is a genuine dispute of material

fact as to whether his misrepresentations were material.  Machoka fails to do so.[3]

First, Machoka states that his misrepresentations were not material because the issue

is not "whether the consul might have denied Machoka a Diversity visa *if he had*

*known Machoka was lying*, but whether he could justifiably have denied the visa *had he*

*known the truth*."  Response at 6 (emphasis in original).  Machoka asserts that whether

he had children was immaterial to whether he received a Diversity visa under

section 1182(a)(6)(c)(i), and, therefore, lying about having children was also

statutorily immaterial.  *Id.* at 10.  Machoka further contends that even if he obtained

his visa through fraud, the admission is not invalid, as he needed to only demonstrate

procedural compliance with the law.  *Id.* at 17.

      Machoka's argument fails to meet the summary judgment threshold, however,

because he relies on cases that are not binding on this court – as they either involve

different statutes, do not contradict precedential authority for this type of case, or a

combination of both.  Response at 2, 10, 17-18; see *Maslenjak v. United States*, __ U.S.

__, 137 S. Ct. 1918, 1922-23 (2017); *In re Quilantan*, 25 I. & N. Dec. 285 (B.I.A.

2010).  In *Maslenjak*, the Court determined that in cases involving a different statute,

---

[3]     Machoka responds to USCIS's motion with seven overarching
arguments that jumble various facts, laws, and cases relating to both whether
Machoka was lawfully admitted for permanent residence status and if he can establish
good moral character.  *See generally* Response.  It is, therefore, sometimes unclear
whether Machoka's arguments relate to the lawful admission issue or moral character
issue, or both.  Regardless, the court concludes that Machoka's arguments are
unconvincing.

18 U.S.C. § 1425(a), the government can prove a false statement was an illegal act by "demonstrating that the defendant lied about facts that would have mattered to an immigration official, because they would have justified denying naturalization or would predictably have led to other facts warranting that result." 137 S. Ct. at 1923. Machoka's argument falls short of proving there is a dispute in this case, because the Court's rule in *Maslenjak* applies to a different statute and does not even contradict the Court's rule in *Kungys*, which applies in this case. Under either rule, Machoka's failure to disclose his children in his 2011 interview would have influenced an immigration official's decision because the official would have had to deny his visa under the FAM guidelines.

In *Quilantan*, the Board of Immigration Appeals held that under 8 U.S.C. § 1101(a)(13)(A), applicants need only show procedural, not substantive, compliance with the law. 25 I. & N. Dec. at 288. The court held that reading the statute any differently could "render null" a specific waiver of deportability that is sometimes "available to aliens who obtained admission by fraud or misrepresentation." *Id*. at 292. Machoka's use of *Quilantan* falls short because it interprets the incorrect statute, section 1101(a)(13)(A) and not section 1101(a)(20). In the naturalization context, Fifth Circuit precedent requires that applicants comply with section 1101(a)(20), and not just procedural regularity but also "substantive legal requirements." *In re Longstaff*, 716 F.2d at 1441.

- 22 -

Machoka argues that the court must harmonize sections 1101(a)(13)(A) and 1101(a)(20), but does not provide authority for this proposition.  Response at 18. Alternatively, Machoka avers that *Longstaff* is inapposite this case, as the issue in that case was a statutory bar for admission to the United States at that time, whereas "fathering children was <u>not</u> a statutory bar."  *Id.* at 18-19 (underline in original).

The court disagrees, as the Fifth Circuit and other persuasive authority make clear that an alien who acquires permanent residence status through fraud or misrepresentation has never been "lawfully admitted for permanent residence," and is therefore ineligible to legally rely upon the facial or procedural appearance of having such status to obtain a benefit such as naturalization.  See *In re Longstaff*, 716 F.2d at 1441; *Monet v. Immigration and Naturalization Service*, 791 F.2d 752, 753 (9th Cir. 1986) (concluding that an alien who had concealed a prior drug conviction in obtaining permanent resident status had not been "lawfully" granted that status and could not seek discretionary waiver of deportation); see also *In re Koloamatangi*, 23 I. & N. Dec. 548, 549 (B.I.A. 2003) ("Nearly half a century ago . . . the Board and the Attorney General determined that an alien who acquires permanent residence status through fraud or misrepresentation has not made a lawful entry upon which to base eligibility for relief."); *In re T-*, 6 I. & N. Dec. 136, 137-38 (B.I.A. 1954); *In re Wong*, 14 I. & N. Dec. 12, 14 (B.I.A. 1972), *aff'd*, 474 F.2d 739 (9th Cir. 1973).

Second, Machoka states that his misrepresentations were immaterial because the purpose of requiring an applicant to disclose his wife and children "is to enable them *also* to receive immigrant visas.  It has *nothing* to do with the principal alien's *eligibility* for this type of visa."  Response at 10 (emphasis in original).  Machoka cites no authority to support this statement and fails to adequately respond to USCIS's argument that spouses and children becoming eligible for immigrant visas affects the initial applicant's eligibility because of the 55,000-person annual cap on diversity immigration.  Machoka argues that he "actually reserved two additional visas for *other* Diversity visa applicants" by not including his children on his application, *id*. at 16 (emphasis in original), but he fails to acknowledge that shortly after receiving his visa, he then applied for his children to immigrate to the United States under the family-preference category, seemingly taking advantage of the new visa that he acquired by not including his children in his DV application.

Third, Machoka argues that the internal FAM guidelines that USCIS cited as evidence are *ultra vires*, as "there is no legal foundation for this guidance," and they are also inapplicable in this case because USCIS cited the 2022 version, not the 2011 guidelines when the immigration officer interviewed Machoka.  Response at 11.  Machoka, however, does not cite any authority for his proposition that the FAM guidelines lack legal foundation or need any legal foundation.  Machoka also overlooks that the relevant FAM guidelines state that they were last updated on

September 20, 2010 – months before Machoka's DV interview in 2011.  *See* 9 FAM § 42.33(c) N6.6 Derivative Status (CT: Visa-1555; 09-30-2010).

Fourth, Machoka calls USCIS's public charge argument "speculative" and "disingenuous."  Response at 11.  Machoka supports this argument by first stating that in 2011 he was not bringing his children to the United States, and because the cost of living in Kenya was much cheaper in 2011, Machoka would have been less likely to become a welfare case.  *Id*.  This argument, however, fails to acknowledge that an applicant must disclose their children to comply with the relevant statute, because children impact public charge categories such as family status, assets, resources, and financial status, regardless of whether the children live in the United States or abroad.  8 U.S.C. § 1182(a)(4)(B)(i)(I)-(V).

Next, Machoka argues that USCIS's argument is speculative because "the consular officer must find it 'more likely than not' that the visa applicant will become a public charge."  Response at 12.  Although this might be a true statement of fact, it does not undermine USCIS's argument that Machoka's misrepresentations were material because it could have influenced the immigration officer's determination on whether Machoka would become a public charge.  Finally, Machoka argues that USCIS failed to cite "[l]ongstanding judicial standards" that "precluded finding an alien is 'likely to become a public charge' absent abject poverty, insanity, disease or disability."  *Id*. (citing *Gegiow v. Uhl*, 239 U.S. 3 (1915); *In re A*., 19 I. & N. Dec. 867

(B.I.A. 1988)).  Neither of the cases Machoka cited stand for this proposition, which would run counter to the statute that enumerates explicit factors immigration officials must consider.

Thus, Machoka has failed to provide sufficient evidence rebutting USCIS's contention that Machoka's misrepresentations were material.  Instead, Machoka makes conclusory allegations, unsubstantiated assertions, and cites non-binding and unpersuasive case law.  In the absence of such evidence, the court concludes there is no genuine dispute as to whether Machoka's misrepresentations were material, and, therefore, that he was not lawfully admitted to the United States.  The motion for summary judgment on the contention that Machoka's application for naturalization was rightfully denied because he was not lawfully admitted to the United States is granted.

## 2.  *Machoka Cannot Establish Good Moral Character*

Even if Machoka were lawfully admitted to the United States, USCIS's second argument is that Machoka has not met the naturalization requirements because he has not been a person of good moral character while residing in the United States.  Brief in Support at 2-3.  To be eligible for naturalization, an applicant must show that he is "a person of good moral character."  8 U.S.C. § 1427(a)(3); *see also* 8 C.F.R. § 316.2(a)(7).  The burden is on the applicant to demonstrate "that,

- 26 -

during the statutorily prescribed period, he has been and continues to be a person of good moral character."  8 C.F.R. § 316.10(a)(1).

The statutory period for which good moral character is required begins five years before the application for naturalization is filed and continues until the applicant becomes a United States citizen.  8 U.S.C. § 1427(a)(1), (3); *see also* 8 C.F.R. § 316.10(a)(1).  The court, however, is not strictly limited to this five-year period and may consider any conduct "prior to that period, if the conduct of the applicant during the statutory period does not reflect that there has been reform of character from an earlier period or if the earlier conduct and acts appear relevant to a determination of the applicant's present moral character."  8 C.F.R. § 316.10(a)(2). Determinations of good moral character must be made "on a case-by-case basis taking into account the elements enumerated in [section 316.10] and the standards of the average citizen in the community of residence."  *Id*.; see also *Brukiewicz v. Savoretti*, 211 F.2d 541, 543 (5th Cir. 1954).

Congress has erected several statutory bars to a finding that an applicant possesses good moral character.  According to section 1101:

> (f) No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was –
>
> * * *

> (6) one who has given false testimony for the
> purpose of obtaining any benefits under this
> chapter[.]

8 U.S.C. § 1101(f)(6).  The Supreme Court has interpreted section 1101(f)(6) to

"mean[] precisely what it says[,]" a person may lack good moral character "on

account of having given false testimony *if he has told even the most immaterial of lies with*

*the subjective intent of obtaining immigration or naturalization benefits*."  See *Kungys*, 485

U.S. at 779-80 (emphasis added).  Indeed, "[i]t is only dishonesty accompanied by

this precise intent that Congress found morally unacceptable."  *Id*. at 780 (quotation

marks omitted); see also *Plewa v. Immigration and Naturalization Service*, 77 F. Supp. 2d

905, 910 (N.D. Ill. 1999) ("[F]alse testimony coupled with an intent to deceive for

the purpose of obtaining citizenship or other benefits is required in order to deny a

citizenship application under 8 U.S.C. § 1101(f)(6).").

Hence, false testimony due to a misunderstanding, a misinterpretation, or an

innocent mistake is insufficient to deny citizenship for lack of good moral character.

See *Plewa*, 77 F. Supp. 2d at 912 ("[I]t seems incongruous that Congress would

consider an innocent mistake, misinterpretation, or incorrect statement as grounds to

disqualify an otherwise upstanding person for American citizenship when the speaker

had no deceitful intent."); see also *Kungy*s, 485 U.S. at 780 (noting that willful

misrepresentations because of embarrassment, fear, or a desire for privacy, are not

deemed sufficiently culpable to brand the applicant as someone who lacks good moral

character).  Congress also created a catchall exception, stating that "[t]he fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character."  8 U.S.C. § 1101(f).

USCIS provides four arguments as to why there is no factual dispute that Machoka lacks good moral character.  First, USCIS argues that Machoka lied in 2020, during his naturalization application process, about his prior misrepresentations and that lies about prior false testimony in order to gain immigration benefits demonstrate a lack of good moral character.  Brief in Support at 18.  USCIS supports its argument by citing *United States v. Haroon*, 874 F.3d 479 (6th Cir. 2017), *cert. denied*, __ U.S. __, 138 S. Ct. 1576 (2018), a Sixth Circuit case that is factually similar to the present case.  Brief in Support at 18.

In *Haroon*, the respondent challenged his conviction under 18 U.S.C. § 1425(a) for procuring his citizenship by making false statements.  874 F.3d at 481-82.  As part of its section 1425(a) analysis, the court found the following facts to establish that Haroon lacked good moral character specifically under section 1101(f)(6):  (1) that Haroon answered, under penalty of perjury, that he had never "given false or misleading information to any U.S. Government official while applying for any immigration benefit" and that he had never "lied to any U.S. Government official to gain entry or admission into the United States[;]" and (2) that

- 29 -

following these answers, during his in person interview and under penalty of perjury, he reaffirmed his prior answers.  *Id.* at 483.  The court held that "[l]ies about prior false testimony given for the purpose of obtaining immigration benefits . . . reveal a lack of good moral character."  *Id.*; see also *Bijan v. United States Citizenship & Immigration Services*, 900 F.3d 942, 946 (7th Cir. 2018).

Second, USCIS argues that Machoka lied in his request for a hearing on his N-400 denial when he stated that the information in his DV application was correct at the time, and this demonstrates a lack of good moral character.  Brief in Support at 21.  Specifically, USCIS points out that Machoka claimed that he did not have children at the time he applied to the DV program, when he had at least two children.  *Id.* at 21-22.  Third, USCIS argues that Machoka lied in his deposition, and even though section 1101(f)(6) is limited to oral statements made under oath, Machoka's lies in his request for a hearing show a lack of good moral character.  *Id.* at 22.  Finally, USCIS argues that if nothing else, the cumulative effect of Machoka's history of misrepresentations demonstrates a lack of good moral character under the catchall exception.  *Id.* at 22-23.

It is undisputed that Machoka repeatedly lied about having children throughout the DV application process and then lied during the naturalization process about those lies.  Machoka filed his DV application in 2009 and marked that he did not have any children, even though Ruth was already born.  CAR at 23.

Furthermore, during his follow-up DV interview in 2011, Machoka stated, under oath, that he did not have any children, even though both Ruth and Brian had been born.  *Id.*  Machoka does not deny that he lied to obtain his visa and instead "admits that he lied on the form by stating that he had no children, when, in fact, he had two young Kenyan children," Petitioner's Brief in Support of Naturalization Petition at 2, and that he did not disclose his family in the 2011 DV interview because he had not initially disclosed them in his initial application and "feared that if I include them, they might think I'm lying and then" not give him a visa.  Appendix at 11:6-8. Machoka finally disclosed his family to the United States government in 2013, shortly after obtaining his visa, when he submitted an I-130 petition to have Mutinda, Ruth, Brian, and Florence immigrate to the United States.  CAR at 47-48.

　　　　Although Machoka disclosed his family to the United States government on or before 2013, he continued to lie about the previous misrepresentations he made during the DV application process.  When filing his N-400 application for naturalization in 2019, Machoka answered, under penalty of perjury, "no" to the following questions:

> 31.　Have you **EVER** given any U.S. Government officials any information or documentation that was false, fraudulent, or misleading?

> 32.　Have you **EVER** lied to any U.S. Government officials to gain entry or admission into the United States or to gain immigration benefits while in the United States?

CAR at 199, 201.  In February 2020, the government interviewed Machoka as part of his naturalization process, and he stated that he had never lied under oath.  *Id.* at 2. In August 2020, Machoka participated in another naturalization interview, where, under penalty of perjury, he did not change his previous answers that he has never given the United States government false or misleading information or documentation and he has never lied to the United States government to gain entry or admission into the United States.  *Id.* at 116-17.  Finally, during his deposition in August 2022, Machoka was asked why he stated on his naturalization form that he had never lied to a United States government official to gain entry or admission into the United States.  Appendix at 16:3-11.  Machoka responded by admitting that he lied to the United States consul to gain entry into the United States and that he had "no answer why [he] lied."  *Id.* at 16:10-19.

Given that these facts are undisputed, USCIS has carried its burden of demonstrating that Machoka lacks good moral character.  The court concludes that the Sixth and Seventh Circuits' analyses in similar cases are persuasive, and USCIS has similarly provided sufficient evidence that Machoka lied under oath about not having previously lied, in order to obtain immigration benefits.  USCIS's evidence indicates that Machoka's situation falls squarely into section 1101(f)(6):  Machoka gave false testimony in order to obtain immigration benefits, demonstrating a lack of good moral character.  Although Machoka's misrepresentations during his DV

- 32 -

application process fall outside the five-year statutory window, his lies during the

naturalization process do not; and even so, the court can look outside this five-year

window if a person's prior actions reflect that his current moral character has not

reformed or if they are relevant to the person's current moral character.  Moreover,

under the catchall exception that Congress created, USCIS has presented sufficient

evidence to carry its burden in demonstrating that there is no genuine dispute that

Machoka is not a person of good moral character, as it is undisputed that he has a

history of lying in order to obtain immigration benefits.

Because USCIS has sufficiently showed that Machoka lacks good moral

character, the burden shifts to Machoka to provide some evidence demonstrating that

there is a dispute as to whether he lacks good moral character.  In arguing that there

is a dispute as to whether he lacks good moral character, Machoka primarily relies on

*Maslenjak* and asserts that the case "dispenses with [USCIS's] theory that 'any lie' or

lying later about having lied earlier (about an *immaterial* fact) can give rise to legal

consequences."  Response at 6 (emphasis in original).  According to Machoka,

*Maslenjak* and the Ninth Circuit case *United States v. Hovsepian*, 422 F.3d 883 (9th

Cir. 2005) (en banc), conclude that the relevant statute "does <u>not</u> preclude an

applicant who has made a picayune misrepresentation on a form from demonstrating

good moral character.  A false statement on a form that plainly is not made to conceal

anything material does not support a finding of a lack of good moral character." *Id.*
at 9 (underline in original).

As explained above, Machoka's reliance on *Maslenjak* is misplaced, as he cites
to the Court's analysis of the requirements that Congress enumerated in 18 U.S.C. §
1425(a), which is irrelevant in this case.  See *Maslenjak*, 137 S. Ct. at 1922-23.
Furthermore, *Maslenjak* does not overturn the rule the Court established in *Kungys*,
which states that "immaterial [] lies with the subjective intent of obtaining
immigration or naturalization benefits" are sufficient to prove an applicant lacks good
moral character.  *Kungys*, 485 U.S. at 779-80.  So too is Machoka's citation to
*Hovsepian* improper.  Both *Maslenjak* and *Hovsepian* actually reaffirm the Court's
conclusion in *Kungys*, which states that an applicant who gives false testimony,
whether material or immaterial, with the subjective intent of obtaining immigration
or naturalization benefits automatically lacks good moral character under
section 1101(f)(6).  *Kungys*, 485 U.S. at 779-80; see also *Maslenjak*, 137 S. Ct. at
1926-27; *Hovsepian*, 422 F.3d at 887-88;   But an applicant who mistakenly, rather
than willfully, makes a false statement has not compromised his moral character.  See
*Plewa*, 77 F. Supp. 2d at 912.

*Maslenjak* and *Hovsepian*, therefore, do not dispute that there is no materiality
requirement in section 1101(f)(6); instead, these cases reaffirm that an applicant
merely needs to subjectively intend to make a misrepresentation in order to lack good

moral character. *Kungys*, 485 U.S. at 779-80. As the undisputed facts that USCIS points to demonstrate, Machoka intentionally misrepresented on his 2020 naturalization application and under oath during his interviews that he had never lied to the government to obtain immigration benefits, in order to attain naturalization. Machoka has provided no evidence showing that there is a dispute to any of these facts.

Machoka next contends that his lies during the DV application process occurred outside the five-year statutory period for determining a person's moral character, and, therefore, USCIS's argument fails. Response at 4. Machoka is correct that there is a five-year statutory period, but this argument fails to address USCIS's evidence that Machoka lied under oath multiple times during the 2020 naturalization process and that the court may take into consideration Machoka's actions that occurred before the five-year statutory period if they reflect that Machoka's moral character has not reformed. 8 C.F.R. § 316.10(a)(2).

Machoka then argues that even if he did repeat the lies that he told in the DV application process and state that he had never lied during his naturalization process, these actions in 2020 are immaterial to a moral character determination because Machoka had already disclosed in 2012 that he had children. Response at 4-5. Furthermore, Machoka asserts that *Tumoe v. Barr*, 474 F. Supp. 3d 997, 1002 (S.D.

- 35 -

Iowa July 23, 2020), which USCIS cites, states that minor or mistaken declarations do not establish a lack of good moral character. *Id.* at 5.

Machoka's arguments miss the mark for two reasons. First, the lie that he told throughout his 2020 naturalization process is that he had never previously lied to the United States government in order to obtain an immigration benefit. Machoka disclosing his children in 2012 does not affect that he lied in 2020 about not having previously lied in 2009 and 2011 in order to obtain immigration benefits. Second, Machoka's lie in 2020 is neither minor nor mistaken; rather, he repeated it multiple times under oath while applying for naturalization.

Finally, Machoka argues that the catchall moral character provision, under which USCIS presents evidence that Machoka lacks good moral character, "speaks for itself and obviously contradicts [USCIS's] argument for summary judgment – which is that Machoka's misrepresentations *statutorily bar him* under 8 U.S.C. § 1101(f)(6) ["false testimony"]." Response at 9-10 (emphasis in original). Machoka provides no evidence to support his assertion, and conclusory allegations and unsubstantiated assertions are not enough to satisfy his burden. *Little*, 37 F.3d at 1075.

Consequently, Machoka has failed to provide specific evidence rebutting USCIS's contention that there is no genuine dispute of material fact that Machoka lacks good moral character under section 1101(f)(6). Rather, Machoka makes conclusory allegations, provides unsubstantiated assertions, and cites non-binding and

unpersuasive case law.  In the absence of specific evidence rebutting USCIS's arguments, the court concludes there is no genuine issue of fact as to whether Machoka lacks good moral character.  The motion for summary judgment on the issue that Machoka's application for naturalization was rightfully denied because he lacks good moral character is granted.

### III.  CONCLUSION

For the reasons stated above, USCIS's motion for summary judgment is **GRANTED**.  Judgment will be entered in favor of USCIS.

**SO ORDERED**.

December 21, 2022.

**A. JOE FISH**
**Senior United States District Judge**